Warehouse Wine and Spirits v. Travelers Property Casualty Company of America May it please this Honorable Court, Chris Finazzo for Defendant Appellate Travelers. This morning I will be asking the Court to conclude that the District Court ruled incorrectly on the competing motions for summary judgment and should have entered summary judgment for the case. If I may first address the coverage action. There is no dispute here on the critical facts. Jamie Ciceretti operated a warehouse for the storage of alcoholic beverages. He went out and had a get and did obtain a permit from the State of New York that allowed him only to store alcoholic beverages. Plaintiff wanted Jamie Ciceretti to store its alcoholic beverages in that warehouse. And to transport it. To the warehouse and to transport it from the warehouse to him when he sent a fax. Yes, sir. But he entrusted that property to Jamie primarily to store it in a warehouse. And that property consisting of tens of thousands of cases of alcohol stayed in that warehouse. All of which had been transported by him, right? Excuse me. All of which had been transported. No. Not, well, they're not transported by him on the inbound. They're only transported by him on the outbound. So the stock, the alcohol, comes in from suppliers. It's offloaded, stays in that warehouse sometimes for months and years. And then periodically, we may have a disagreement, but either once a week or on average twice a week, there's a call to Jamie Ciceretti to say, I want you to load certain cases on a truck. Was anything, were any of those bottles transferred from the retail store, because there are too many or something like that, transferred from the retail store to the warehouse? No, sir. To my knowledge, and I believe as the record reflects, all of the stock that's in that warehouse comes from suppliers. The only trucking involved. And they're trucked in by the suppliers. Correct, Your Honor. So the transportation that he does, did, is solely from the warehouse to the retail store. That's correct. And so, and there's also no question that the theft occurred from the warehouse, had nothing to do with the trucking operation. And as found by the district court, and not appealed by plaintiff here, those thefts occurred in December of 2011. I'm going to get to what that might mean for valuation. But does the exception from the exclusion only apply when the truck is moving? No. And that's, and the district court went awry here. As the policy is structured, there are two parts. There's the property or property floater coverage part, which is the first part. And then there's the transportation coverage part. The transportation coverage part covers goods that are in transit, in the possession of a motor carrier. There's two requirements under that part of our policy. Well, what about the property floater coverage? I'm going to get to that, just excuse me. Under the property coverage, that property coverage is geared to the location. And the court erred when it said, well, Travelers is contending that this exception to the exclusion only applies to things in transit. Not correct. Let me give you an example. Example is, Jamie Cesaretti loads a truck on Friday, and that truck sits at that location for Friday, Saturday, Sunday, until it moves on Monday. That truck is not in transit. That property is not in transit. It would still be covered under the property location part, subject to its provisions. So it's changing the policy. So what if the goods are delivered on Friday from Seagram's? Same thing, and they're not- Let me just finish the question. Okay? Sorry, Your Honor. So, but the truck's leaving on Monday. So they have a little warehouse where they keep the liquor over the weekend. And does the exception to the exclusion apply that weekend? Well, I'm not clear what Your Honor is asking me, but let me try to- Well, you just said- Try to address it. Let me be clear then. I'm sorry. You just said that if they load the truck, but the truck doesn't immediately leave, it sits there over the weekend. They load it on Friday. It doesn't leave until Monday. There's coverage, because it's on the truck. And it's not in transit. It's not in transit. And not that location. I'm saying is the goods arrive on Friday, they're going to load the truck on Monday for delivery, and it sits in the warehouse over that weekend. Then the exception to the exclusion doesn't apply. Is that your view? Well, Your Honor, if what you're asking me is this, that that shipment, that inbound shipment, isn't destined for that location. It's destined for the store in New York so that it remains in transit. There's a temporary stop there. Then the question, then there would be coverage for there because it's at the location. It doesn't matter whether it's in transit or not in transit. It's at the location. The exception would apply because it's still in the, well, if the property is viewed as still being in the possession of the inbound truck, it would be in the custody of that common carrier, but it would be at that location. If it's not, it's designated for delivery to the store on 54th Street. But that delivery, that truck doesn't leave until Tuesday. It comes in on Thursday, they put it in a corner of the warehouse with a stamp on it that says go to 54th Street on Tuesday during the regular delivery. Is that covered for those four days? Is that? If it's at the location. With the warehouse? It's covered. So how far back in time do you go? I don't think you go, well, you go to the question, I was addressing the question of whether it's in transit or not. If it's at that location, it's covered. If it's stolen by a person- Just back me up for a second because I think I'm getting confused and that's easy to do. It's got to be my fault, Your Honor. I'll take responsibility for that. When you say it is covered, can we just agree on what it is covered? The property in that truck is now covered property under the property float up coverage form because it's at that location. But it's subject to the exclusion, right? But it's subject to the exclusion. When you say covered, we thought when you said it's covered it meant you'd pay for it. No, it's covered subject to that exclusion. But not to the exception. But- It's like who's on first, sorry. The property, let me, I'm going to just add one other factor. The property is at the warehouse and is stolen the way it was stolen here. Is travelers going to pay for it or not pay for it? Travelers is not going to pay for it. And does that mean it is covered? Well, I was using it a different way. All right, thank you. It's covered property. It's covered property, but it's not covered under the policy because the exclusion applies. It's at the warehouse, in storage, and it's not in the custody of a carrier for hire. If I may, if I may. Implicit, a carrier for hire, and we agree with the district court, a carrier for hire is defined as a person or entity that carries goods from point A to point B for transportation. Right. What the district court was suggesting is that this policy should have been written to say, except this exclusion does not apply to a carrier for hire, hired to transport goods from point A to point B, okay? But that second clause is redundant of the phrase carrier for hire. Ordinary people know, understand, that when something is in the custody of a carrier for hire, it is for the purpose of transportation. This property that was in this warehouse and was stolen from this warehouse after weeks and months, and sometimes years, was not there for purposes of transportation. It was there for purposes of- Was Bestway a carrier for hire? Excuse me? Was Bestway a carrier for hire? In one setting it was. But just because they could be described as a carrier for hire in one setting, doesn't mean they're a carrier for hire for all purposes and all times. People and companies can act in different ways at different times and be described as different things. The question is what they're doing, not who they are. Correct. And that's the reality of what happened here. To suggest that this theft of 4,000 cases occurred when it was in the possession of a custodian for hire, distorts the reality of what happened here. If I may, I'm sorry, Your Honor. So how, I mean, it seems to me we're drawing a very fine line because the booze sitting in the warehouse is always going to be moving. I mean, it's except- Well, eventually. Except when the owner takes it and is drinking it. I mean, it's supposed to go on to somebody who's going to sell it in retail. And always going on to somebody who's going to sell it in retail. Eventually. I mean, in theory, yes. No, always, always. There isn't a bottle there that isn't going to move along in transportation from that spot to the other spot. Eventually, Your Honor, but it's not in transportation. But it's not in transit is what you're saying? No, it's not being transported. It's not just the technical phrase of in transit. We have shipments here that came in in March of 2011. Into the warehouse that was still there when the theft occurred in December of 2011. We have product that came in 2009 and 2010 that was still in that warehouse at the time that Jamie Cesaretti stole it. So then to Judge Droney's question, let me try to re-articulate it. The shipment from Seagram's is coming in on a Friday. And it is passing through the warehouse, getting loaded on a truck on Monday. And is moving on to the insurer. That never happened in this case. What? Is that covered? Sorry. Is that, and a loss occurs with respect to that shipment. From the warehouse? It's just moving through the warehouse and getting- It's not covered. For two days. It's not in the custody of a carrier for hire. Of the insured, sorry, of the named carrier for hire best, right? In the custody of any carrier for hire. It's in a warehouse. It's in a warehouse being stored. All right. Even if it's the carrier for hire's warehouse. Well, but that begs the question, right? Which is going to be put on a truck on Monday, two days later, because that's everybody's plan. Okay, in that hypothetical. Yeah, I'm agreeing it's a hypothetical. In that hypothetical, where I have a carrier for hire that's operating a warehouse as part of its carrier for hire activities, and that warehouse is a temporary waypoint to accumulate, split, do other than trans-shipments, however we want to call it. Then it's still in the possession of a carrier for hire. And if that carrier for hire were to steal it, if it had been entrusted to the carrier for hire, and the carrier for hire stole it, it would be a covered loss. But that's not what happened here, okay? And the facts are important to what happened here. When plaintiff bought liquor from suppliers, it determined how much it wanted to go to the store out of a shipment. How much it wanted to go to this warehouse in a hot pot. There was never an event like the hypothetical that your honor has described. At no time in the three and a half years that products stayed in this warehouse was there ever any such event. Okay, thank you. Mr. Farnazzo, you've reserved two minutes for rebuttal, and Mr. D'Antonio, you've reserved some time for rebuttal. Okay, I didn't get to my valuation issue. Well, we've been asking you other questions, so we'll talk about valuation on rebuttal. May it please the court, good morning, your honors. My name is Dennis D'Antonio with the law firm of Wagon Myers, and I represent Warehouse Wines, the appellee here. I think any discussion of the law facts of this case must start with the basic proposition that the Second Circuit is well aware of. And that is that a carrier can limit its liability in a policy, but that it has to do so in clear and unmistakable language, so that the reasonable business person reading that policy is on notice beforehand as to what their coverage terms are. And I can't help but note, listening to the questions and answers that were just posed and that much debate about what the policy means, the policy's not clear. And as Judge Forrest below stated quite simply and quite directly, and I think it's the gravamen of this case, is that the policy that the carrier for higher exception to the exclusion reads very simply. There's an exclusion, and this is at the record page A573, this is the policy, and this is where the analysis, I believe, begins and ends. We will not pay for loss caused by a resulting from any of the following, and then D is the relevant provision. And it says, dishonest acts by you or anyone entrusted with the property, etc., etc., and the accessory was entrusted with the property. If there was no further language in this exclusion, we wouldn't be here, because Sessoretti stole the goods and Sessoretti was someone we entrusted it to. But then the language goes forward and says, this exclusion does not apply to property in the custody of a carrier for hire. There's no further words. It doesn't say if he holds it for more than three days or 30 days, or if it's in his warehouse. It just says a carrier for hire. We know Sessoretti's a carrier for hire because the- I don't think he was a carrier for hire, but never, ever carried goods for your client. Make no difference whatsoever. It's the identity that matters, not the activity. So if he went with his station wagon and everything was delivered from the warehouse to his retail store in his own station wagon, the result would be the same. If who delivered in his station wagon? Your client. And who stole it? Same, it's all the same. Sessoretti's a carrier for hire who I entrusted the goods to. That's what triggers this. And you're saying it doesn't matter whether the carrier for hire did any carrying for hire for your client. Exactly right, Your Honor, that's correct, because you can only read the words in the exception to- No, I understand. Yes, I agree with you. I don't know why you're saying it, I just want to be sure that's what you're saying. That is what I'm saying, and that's not based upon legal theory or argument or posturing. It's based upon what the carrier said to its insured when it accepted premiums for $4 million worth of inventory. Nobody expected that that coverage was limited to $4 million being in a truck that was hijacked. There was a warehouse, there was $4 million worth of inventory, and contrary to counsel's assertions to this court, that was always inventory that was moving into the store. If the warehouse had been contracted for by Bess, the warehouse space had been contracted for by, well, let's start with the wine shop, right, wine wholesalers, as a warehouse. And the carrier was to bring it there, put it there, and then go get it when he got a fax to do it. But it was stolen from the warehouse, which was a separate operation. We wouldn't be having this discussion. Actually, you would be covered under that circumstance also, Your Honor, because it's the identity of the person you've entrusted it to. The best way logistics is licensed under the UCC as a carrier for hire. That means they meet certain criteria imposed by the federal government to have that licensure. So I would argue that the purpose of this clause, which is irrelevant, quite frankly, because it's not the carrier's intent. The carrier's intent doesn't govern. It's what a reasonable interpretation is if the clause is not clear. That's the only analysis that takes place here. And there is a reasonable interpretation that favors my client. And since the carrier chose not to put all of the extra language in this exclusion, they can't rely upon it now. But back to your question, Your Honor, it's the identity of the individual or entity you entrust the goods to. And it has nothing to do with the knowledge of your client. I mean, supposing, same facts except the transportation into the warehouse is done by the distributor for the liquor. The transportation out of the warehouse is accomplished through his own station wagon. And he doesn't know that this, the crook. He doesn't know that the crook is, in fact, also a- Carrier for hire. Carrier for hire. That doesn't matter. He's still a carrier for hire, even though your client didn't know. Not based on this policy language, you're absolutely right, Your Honor. It's only what they write in the policy when they're selling the policy. It's who he is, not what your client voted. It's what the contract says. If you've entrusted the goods to someone who steals, the goods are insured and covered for $4 million. The exception is if they've stolen by someone you entrusted to. The exception to the exclusion is if the person you entrusted it to happens to be a carrier for hire, then that exclusion doesn't apply. And if they wanted there to be a duration for when or how long it could be held, they had to say that for 30 days, etc. But Warehouse Wines had its own warehouse. No. I know it didn't, but if it did, then the exception to the exclusion would not apply. That's right. There would be no coverage for theft. Yeah. Right? Yeah. Does it matter that the location is listed in the policy? Yes. It's located in 100 Marcus Boulevard, Hall Couch, New York? Yes, we made that point at trial. Not only was it listed, they went to the location. They inspected it before the loss. They approved it before the loss. They knew it had $4 million worth of inventory. It's named Best Way Logistics and Transport. My client's store, and this is in the record also, is only 2,000 square feet. It happens to do $16 million a year in sales. So obviously in 2,000 square feet, the operation doesn't include warehousing at the store. And this carrier knew that also. And the way the store worked was they used a carrier for hire who was licensed to transport the goods. Was licensed as a carrier for hire. And they drop shipped everything coming from Seagram's or vendors or wherever into that facility for temporary holding until it could be shipped into the store to satisfy sales needs. And contrary to what council told you, the goods didn't sit there for years. There's no record of that. We were doing $16 million a year in sales. There was only $4 million worth of insurance at the warehouse. The inventory turned over sufficiently well for the business to have done $16 million a year in sales. And this contract has to be enforced as it was written. If the carrier wanted to limit its liability to not include the $4 million of inventory that they were being paid a premium for, while the carrier for hire held it in its licensed warehouse, then all they had to do was define what carrier for hire meant in the policy. And then they would have put a buyer of this contract on notice beforehand that maybe you're going to have to buy a separate policy. No hard liquor, no wine. Yeah, I think, no, there was some wine. There was some wines also. But it was primarily hard liquor. I'm having a little fantasy about how every year the wine gets older and gets more valuable as it's sitting in the warehouse. I'm not sure it matters. We're sure it's climate controlled too. Yes, okay. So my time is up, I believe, or do I have another minute or two? So that's the point I'm making, Your Honor. Why don't you anticipate, if you would for, at least for me and my colleagues, the arguments that are going to be made, because you know them from the brief, with respect to the amount assessed. Okay, Your Honor, that's the easy part. I've been doing this for 30 years. I do insurance coverage litigation. Every single element of damages in every single case has to be proven to a reasonable certainty. That's the burden of the plaintiff. There has to be some method or some formula to the calculation. That was your burden. Sorry? That was your burden to show. Yes, yes, that was our burden to show. I don't have to prove every single measure of damages. The case law is clear on that also. And you don't have to prove it to an exact certitude, albeit in this case we actually did. Because there was a perpetual inventory, it was a valuable commodity, so he kept track, more or less, of every single bottle. After the loss, there was an inventory. There were 24 trucks of merchandise, over 4,500 cases of product that was inventory and removed. One truck went to the store. It did not go into the claim. At one point, there appeared to be a 226 case discrepancy, which actually reduced the claim. But the next day, Mr. Goldstein, who's in court today, testified. That's because that didn't go to the Bumblebee Warehouse, that went directly to my store. It's not in the claim, it was 226 cases, one truck went to the store. I have the testimony of their forensic accountant, Mr. Altman, who certified and audited the loss. And he came to the conclusion that the books and records reflect the loss exactly how it's been presented. It's 100% correct. And then the last point is to use the December or January pricing. We argued to the court that it should be January pricing, because what this policy says about the loss, if I may continue. What this policy says about the loss is, and I argued this to the judge, unsuccessfully, she took December. But I argued it should be January, because the policy says that for valuation, this is A571 in the record. The value of the property will be the least of the following amounts. Number three is the least of the following amounts. It says the cost of replacing that property with substantially identical property. In the event of a loss or damage, the value of the property will be determined as of the time of loss or damage. We don't really know exactly when the loss was, because it was being stolen according to Cesaretti's allocution over a period of time. It wasn't all stolen in December, we know that. It was discovered and realized and recognized as a loss in January. And that's the only time I could have replaced it, is once I recognized it was gone. So I argued to Judge Forrest that the period she should use is January, because that's the first time under the policy, I had a loss that I recognized that I could have replaced, and that conformed best to the policy language. She, however, took their argument that it should be December. Now, I don't have the burden of trial approving December and January, and there's a passage between Judge Forrest and opposing counsel as to what it should be, December or January. She invited him to come forward with December evidence. The evidence on December was that from a sampling, because they had all of the December pricing. From what they put into evidence, from a sampling it was lower. She gave them the benefit of the doubt, and she discounted the whole claim. A 13% discount. Yes, even though it was a modest sampling that showed that. So if anything, we were shortchanged on that analysis, but so be it. You have not crossed the field. We haven't crossed the field, regrettably. Thank you, Mr. Chairman. Thank you. With the court's permission, I'm going to address the carrier for hire business just for a very short period of time. We'll give you some time to do that. Just for a period of time. And the damages. And then the damages. There was a separate agreement here between Jamie Cesaretti as a warehouse man and Jamie Cesaretti as a carrier for hire. They had an agreement as to the trucks, how much they would charge per truck, per load. And then there was a written agreement that is in the appendix as 183, A183. That was an agreement for warehousing only. That's all it related to. And these two parties treated these relationships separately. There were separate bills. There was not one combined bill. There was a bill for warehouse services. And there was another bill for trucking services when the trucking services were rendered. This was completely separate. If you accept this construct, that simply because the name can be attached of a carrier for hire to somebody at some point in time, it applies to everything they do. You create great distortions in commercial commerce. Let's just look at Jamie for a second, just for one more second. And I think one of your honors may have addressed this. We have Jamie here with two customers. One customer he provides only warehouse services for, and that customer is insured by travelers. Another customer he provides only trucking services for, and that customer is not insured by travelers. Jamie's, the exact same thing occurs. Entrust the property to Jamie for storage. Jamie stores it in the warehouse pursuant to the warehouse agreement and warehouse license, and Jamie steals it from that warehouse. Under this construct, the plaintiff argues there's coverage, because although Jamie stole it, and although it was entrusted to Jamie, Jamie was a carrier for hire, even though he performed no carrier for hire services to the customer whose property he stole, even though that was never in the contemplation of that customer, even though the customer may not have known that Jamie was providing this, because once you attach the label, it's their position, it was the district court's position, that he's a carrier for hire no matter what he does. If he's operating a nuclear power plant, he's a carrier for hire. If he's performing medicine, surgery without a license, he's not a doctor, he's a carrier for hire, okay? With that, moving on to the valuation issue. Valuation here is defined by the policy at the time of loss. There is no argument that the loss occurred in January, there's no evidence. There is some evidence that it occurred sometime in 2011, and the vast majority of it occurred in December of 2011. And the district court so held, so found, and there's no appeal from that. So, we have a policy that says time of loss, the district court concludes the time of loss is December. Jamie comes into New York, Mr. DeAntonio Glossovis, comes into New York on December 20th and confesses to the theft to Mr. Goldstein. If discovery were applicable, and it is not, it would still have been discovered in December. Now, this is a regulated industry with published prices that apply for the entire month. There's a book for every month. If this was just about arguing to the court two different measures, plaintiff would have put into evidence both the December book and the January book, okay? Plaintiff didn't do that. And in fact, the judge, district court should not have even admitted the January book into evidence because it was irrelevant. This court, you mean the trial court? I mean the trial court. I said, I think I said the district court if I said this court. I'm sorry, I'm sorry. But the court shouldn't have even admitted that incident. And surely shouldn't have tried to rely upon what was irrelevant evidence in fashioning its remedy. So what did the plaintiff really do here? The plaintiff wanted January prices. Travelers had been screaming about this issue since the denial letter, all through the case. The denial letter, the motions, the openings, throughout this entire litigation. They wanted January. So they thought they could leverage her honor, Judge Forrester. They wanted to create a situation in which Judge Forrester had two choices. She could go with them on January or she could give them nothing, okay? That's what they thought was the strategic gamble. But what Judge Forrester was not willing to go there because the policy said what the policy said. And that was the only measure that would apply to this case. And so Judge Forrester tried to fashion a remedy. And she had no business doing that and she had no basis. Why was a 13% reduction not reasonable? Because there's no foundation for it in the evidence. All that Judge Forrester did. Is forest. I'm sorry, Judge. For the trees, right? I'm just, my fault. Not the guy who cuts them. Meant no disrespect. How did she calculate the 13%? She got to the 13% by this method. She had only ten, the prices for ten items in evidence. One of those had come in through plaintiff's examination of- So she takes the ten items, sees the increase in prices, and says that's a 13% increase and goes down. Does that- Correction. She compares, all she does is she compares item by item for those ten items. The difference between December and January. And what's wrong with that? She adds those numbers up and she comes out to 13%. One, it's not, there's no analysis done that that sampling, that those ten products in whatever quantity, she doesn't even address the quantity issue, the weighting issue, that those ten samples or ten products are representative sample and statistically valid. There's no expert testimony. That's the stuff of expert testimony. There's no expert testimony. She just comes to that conclusion without any analysis. If an expert had done this, if an expert had walked into this court or into the district court and said, I've only got these ten, I'm going to add up this column, add up that column. That comes to 13% and that represents approximately 240,000 of this million won at January prices. And I've concluded that it applies, it should apply to the other million won. Without anything else, that would have been a net opinion, would have been stricken, and would have never been considered an evidence. What the plaintiff is really arguing for here is a shift in the law on burden of proof on damages. Plaintiffs take in a situation where damages are hard to measure, indefinite to measure, prospective profits, lost royalties, other calculations that are impossible to come to uncertainty. Did you put in the December 2011 price? I did not. Well, nine of the items that are in here were put in by me for another purpose because the judge challenged me to prove that there was a material difference between the January prices that they wanted and what I contended applied under the policy. Did you put in the prices from December to show that 13% was wrong, was not in the ballpark? I didn't even know that the judge was going to do this. I argue that there was no basis in the record for her to render a verdict. There is a basis, I'll modify that a little. For her to calculate damages. To calculate, I'm sorry, to calculate damages. There is a basis to calculate damage because evidence came in through me of $243,000 approximately. That's all there is. We didn't argue this issue. It was never in the case. And I suggest to your honor that it wasn't my burden to prove that percentage wrong. Because it is unsubstantiated in the record. In effect, what Judge Forrest did, is she was confronted with this problem. She didn't want to give them only what they had put, only what she had a record basis for. So she turned herself in. Let me ask you this question, and then we'll let you sit down because you've spent a lot of time trying to convince us. It would seem to me that the owner of the warehouse, the insured, could come in and say, look, without any documents at all, but I've run through my numbers and I under oath, your honor, my best estimate of what I lost based on my years of experience here, etc. And quick review of what came in and what went out is a million dollars. Is that evidence incompetent? It's not incompetent, your honor. Could the judge rely on that evidence? Well, sorry, therefore, the judge could rely on that evidence, right? Yes, assuming I couldn't disprove it. That's right. Right? But, here's what happened here. I'm trying to find my citation to the exact page. But what happened here is, Mr. D'Antonio asked Mr. Goldstein whether the prices in December were different than the prices, no, I'm sorry. He asked Mr. Goldstein whether Mr. Goldstein had the December price book. And Mr. Goldstein said yes. And he never asked the next question. He never asked Mr. Goldstein, well, since you have the December price book, and we have January prices here, and you've already testified that generally, almost always, December prices are less than January. How much are December prices less than January? I can actually find that in the record for you if you give me a moment. He never asked that question. And the reason he never asked that question is because I am absolutely right about what was going on here. But the important thing, the real issue is, the absence of that question left Judge Forrest with no basis to do what she did. He had the books. No, she didn't have the books. She only had January. She did not have the December book. The December book was never put in evidence. Never. And there's no explanation for it. And it was plaintiff's burden to put it in evidence, not to defend it. All right, well, she had the January book, and then she gave you a discount. Correct. But there's no foundation in the record for the discount. That discount is speculative. Thank you, Your Honor. Yes, no, we have your argument, and I understand fully why. Thank you, Your Honor. May I ask a question? That went quite far for the rebuttal, and ultimately the top. Can I have some time for two minutes, please? Every time somebody says two minutes, you can have one minute, and then we'll see if you can stay under two. That being the case, if you look at page 33 of my brief, here's the dialogue between Mr. Fonaso and the judge on this January date. I submit, Your Honor, the evidence will show that there exists no basis to apply the higher January pricing. The court then says, so who's going to have the evidence in the record as to the December valuation? He says, I assume that's going to be plaintiff. And then here's what it comes down to, the court. Well, if they're only going with January, then they may or may not want to put in December. So is there somebody that's going to put in December that you are aware of? Do you have a witness, or Mr. Goldstein, are you going to cross-examine him with that? Or how is that going to come in? Mr. Fonaso, well, I'm not sure what you're asking me, but I'm very interested in what you're asking me. Because if you're proposing to me, it's my burden. And then the court says, and I'm skipping over, defendant can poke holes in something, but I can't assume a difference in pricing. Paraphrasing between December and January, that's material unless I have evidence as to what that is. Mr. Fonaso, that difference will come in through Mr. Goldstein and probably Mr. Altman, who was their expert, who had all of the December price book when he did his analysis. And Mr. Altman testified, he relied on a statistical analysis. We had only 84 items stolen. They had pricing on 11 of the 84 items. That, to answer your Honor's question, is how the judge came up with the 13%. Because she had a statistic sampling of the 84 items of their December price, because she had 11 of them. And that showed that in December, it was 13% less for those 11 items than in January. It's perfectly permissible to use statistical sampling. It's done in every accounting case. And she applied that statistical sampling analysis, so there was a reasonable basis for how to meet the standard to come up with the damage estimate that should satisfy any court based upon the records. Thank you very much, Your Honor, for that extra time. You did it almost in two minutes, and congratulations. Thank you. All right, we will deem the case submitted, as one of my colleagues says, and we will reserve decision. But thank you both for your arguments.